GEORGE D. YARON, ESQ. (California State Bar #96246)
D. DAVID STEELE, ESQ.   (California State Bar #171636)
**YARON & ASSOCIATES**
1300 Clay St, Suite 800
Oakland, California 94612
Telephone:  (415) 658-2929
Facsimile:   (415) 658-2930

Attorneys for Defendant
PUGET SOUND COMMERCE CENTER, INC., erroneously sued
as and formerly known as TODD SHIPYARDS CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY KELLY and MOLLY KELLY, | Case No. 3:11-cv-03240-VC |
| Plaintiffs, | |
| vs. | **TRIAL BRIEF OF PUGET SOUND COMMERCE CENTER, INC., formerly known as TODD SHIPYARDS CORPORATION** |
| CBS CORPORATION (FKA VIACOM INC., FKA WESTINGHOUSE ELECTRIC CORPORATION), et al., | |
| Defendants. | Trial Date:     May 11, 2015<br>Judge:          The Hon. Vincent Chhabria<br>Dept.           Courtroom 4 - 17th Floor |

Trial Brief

# I.  SUMMARY OF ARGUMENT

Plaintiff Barry Kelly ("Plaintiff")[1] was  allegedly diagnosed with mesothelioma in 2011 due to alleged exposure to asbestos, while serving as a U. S. Navy Officer in the 1970s and 1980s.  As to Defendant Puget Sound Commerce Center, Inc., fka Todd Shipyards Corporation ("Todd"), Plaintiff never visited any of its shipyards, nor ever worked near or around Todd employees.  Rather, Plaintiff's sole claim against Todd is that he was negligently exposed to asbestos aboard the USS DOWNES, a U.S. Navy warship assembled by Todd, pursuant to Navy contract and Navy specifications, in about 1968.  Plaintiff asserts that Todd should be held liable for negligently failing to warn him that the Navy ship contained asbestos-containing products, even though these products were specified by the Navy. More so, Navy Technical Manuals, aboard the USS DOWNES, contained explicit warnings about asbestos and safety measures to reduce the risk of asbestos exposure. In its defense, Todd makes the following arguments:

First, a Navy ship is not a "product" for purposes of Strict Liability, and a private shipbuilder, who assembles the ship for the Navy, is immune from liability under this theory[2].

Second, Todd breached no duty to warn the Navy and/or Plaintiff about the risk of developing mesothelioma from asbestos, because the Navy and/or Plaintiff either knew, or should have known, about the risk from asbestos, which was then highly regulated under federal law.  Indeed, the Navy had written warnings about asbestos in its Technical Manuals on the USS DOWNES, when Plaintiff served on the ship.

Third, since the USS DOWNES was a Navy ship, Todd is immune from liability under the "government contractor" defense articulated by *Boyle* v. *United Technologies Corp.*, 487 U.S. 500 (1988).  Under the "government contractor" defense, a party is shielded from liability "for acts done by him while complying with government specifications during execution of performance of a contract with the United States." (*McKay v. Rockwell Intern. Corp.*, 704 F.2d 444, 448 (9th Cir.

---

[1] Plaintiff's wife, Molly Kelly, has also asserted a claim for Loss of Consortium

[2] See *Kelly, et al v. CBS Corporation, et al.*, E.D. PA Civil Action, No. 2:11 - 67269 -ER, Order, dated January 28, 2014, by Judge Eduardo C. Robreno ("Robreno Order"), whereby Judge Robreno granted Todd's Motion for Summary Judgment as to the Strict Liability claim, but denied Todd's Motion as to the Negligence claim.

1983).)

Fourth, Plaintiff was a highly trained, highly educated Naval Engineering Officer.  With both actual and constructive knowledge, Plaintiff was a "sophisticated user," which is recognized as a complete affirmative defense, under California, Federal, and Maritime Law. (See, e.g., *In re Air Crash Disaster* (6th Cir. 1996) 86 F.3d 498, 522; *In re Related Asbestos Cases* (N.D. Cal. 1982) 543 F.Supp. 1142, 1151; *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56).

Fifth, Plaintiff cannot show the element of "causation," i.e., the nexus between Todd's alleged act or omission (failure to warn) and his injuries. The Naval Technical Manuals aboard the USS DOWNES detailed both the risk of harm from asbestos exposure, and the necessary precautions for Navy personnel to employ, to minimize such risk.  Plaintiff's failure to follow Navy directives regarding appropriate safety measures breaks any causal chain between Todd's acts/omissions and Plaintiff's injury.

## II.  STATEMENT OF FACTS

### A.  Plaintiff's Training in the United States Naval Academy

Plaintiff attended the United States Naval Academy from 1969 to 1973, where he obtained a Bachelor's of Science degree in Ocean Engineering. (Exh. A, Plaintiff Depo., Vol. 1, 14: 21 -25; 15: 17 - 21.)

While at the U.S. Naval Academy, Plaintiff received college-level academic training and professional military training. (Plaintiff Depo., Vol. 1, 15: 1 -16.) Specifically, Plaintiff took standard engineering classes, including Statics, Dynamics, Probability and Statistics, Solid Mechanics, Naval Power Systems, and Aerodynamics. (Plaintiff Depo., Vol. 1, 15: 22 - 16:2.)  He also learned generally about insulation materials, including asbestos, but did not learn that asbestos caused any hazards. (Plaintiff Depo., Vol. 2, 185: 12 - 186: 6.)

Plaintiff was sufficiently trained in his field of engineering to accurately explain in detail how valves and pumps work, and what types of liquid, gas, oil and fuel flow through them on Navy ships. (Plaintiff Depo., Vol. 1, 20: 19 - 21:18.)

### B.  Plaintiff's Naval Service

As an Ensign, Plaintiff first reported aboard the USS DOWNES in July 1973, at Long Beach

1  Naval Shipyard. (Plaintiff Depo., Vol. 1, 21: 19 - 25; 26: 18 - 20.)  In total, Plaintiff sailed aboard the

2  USS DOWNES from about December 1973 - August 1975. (Plaintiff Depo., Vol. 1, 26: 18 - 20; 32:

3  11 - 14.)  Plaintiff was the Assistant Main Propulsion Officer from July to December of 1973.

4  (Plaintiff Depo., Vol. 1, 29: 4- 20.)

5      From October to December of 1973, Kelly was sent to "1200 Pound Engineering School" in

6  San Diego, for additional training concerning the ship's propulsion system, and then returned to the

7  USS DOWNES to become the Main Propulsion Assistant Officer, responsible for the M and B

8  Divisions.[3] (Plaintiff Depo., Vol. 1, 29: 15 - 20; 32: 3 - 10.) The M Division was the Machinists

9  Mates' Division, which operated and maintained the engine room, while the B Division was the Boiler

10  Division that was responsible for the fire room and all associated equipment therein. (Plaintiff Depo.,

11  Vol. 1, 32: 15 - 33: 5.)  Plaintiff's duties were to technically assist the Chief Engineer in the

12  management, maintenance, and operation of the propulsion system aboard the ship.  He supervised

13  all of the maintenance on pumps, valves, pipes, boilers, condensers and evaporators. (Plaintiff Depo.,

14  Vol. 1, 33: 6 - 34:1.) He also was responsible for developing the annual schedule of preventive

15  maintenance. (Plaintiff Depo., Vol. 1, 47:4 - 48:9.)

16      Plaintiff reviewed several U.S. Navy Technical Manuals on the USS DOWNES, which

17  contained sections on safety.  (Plaintiff Depo., Vol. 2, 205: 5 - 14.) Plaintiff believed that the Navy

18  Technical Manuals were initially prepared by the original equipment manufacturer, and then approved

19  and published by the Navy. (Plaintiff Depo., Vol. 2, 230: 5 - 17.)

20      One of these Navy Technical Manuals, published by the Navy was Naval Ships' Technical

21  Manual, Chapter 9390, on "Thermal Insulation," dated July 1, 1972.  Todd asserts that it was aboard

22  the USS DOWNES, during Plaintiff's service.  It detailed the mandatory use of respirators and other

23  precautions for all Navy personnel who might be exposed to asbestos dust. (Wasson Decl., ¶ 12,

24  Exhibit 3.)  Plaintiff did not use a respirator, but knew they were available because he saw painters

25  aboard the USS DOWNES wearing them.  (Plaintiff Depo., Vol. 2, 211: 8 - 25.)

26

27  _____

28  [3] At this Navy training, Kelly heard "asbestos" mentioned several times as insulating material, but denied there was any discussion about the health risks of working with asbestos.  (Plaintiff Depo., Vol. 2, 242: 3 - 14; 245: 4- 8.)

### C.     The Construction of the USS DOWNES

On July 22, 1964, Todd executed a written contract ("Contract") with the United States of America (Contracting Officer, W.A. Brockett, Chief, Bureau of Ships), Nobs-4782. The contract was for the construction of 7 Ocean Escort Vessels (DE- 1052 through DE-1070 (the last of which became the USS DOWNES.)  The initial contract price was about **$32 Million** (for all ships).  The Contract mandated that the applicable specifications "shall" be the "Bureau of Ships Specifications for Building Ocean Escort DE 1052 Class," dated October 15, 1963 ("Specifications"). Todd complied with these Specifications when building the ship.

One important addendum to the Contract is an Amendment of Solicitation/Modifications of Contract, dated March 17, 1972, which states the following:

> The Contractor (Todd) requested release of the two percent (2%) performance reserve currently withheld on the Ocean Escort Vessel DE-1070 (DOWNES) established under paragraph (b) of Clause 8 of the General Provisions of Contract Nobs-4782.

> *       *       *

> Inasmuch as the guaranty period of the DE-1070 expired on 71 December 29 (sic), and in view of the aforesaid provision, release of the two percent (2%) performance reserve in the amount of $383,702.99 is hereby authorized for payment.

This provision in the Contract means that Todd completed the USS DOWNES, that the Navy inspected the ship and tested it via ordinary sea trials, and that the Navy made no complaints to Todd about the ship during the Guaranty period of 6 months.  Based thereon, the Navy paid nearly $400,000 to Todd under a "performance reserve" – all of which is substantial evidence that Todd complied with the Specifications.  The approval of, and compliance with reasonably precise specifications, are the first two criteria of the Government Contractor Defense under *Boyle*.

### D.     Plaintiff's Potential Exposure to Asbestos Aboard the USS DOWNES

As a Naval Officer, Plaintiff would not be expected to perform hands-on work aboard the USS DOWNES, and testified that such work "wasn't my job description" (Plaintiff Depo., Vol. 1, 48:10 -13.) Plaintiff supervised and delegated the work to enlisted sailors. ( Plaintiff Depo., Vol. 1, 49: 10 - 15.)

1    Plaintiff generally described, as a bystander, observing machinists using putty knives to

2    remove gaskets from valves, and using packing hooks to remove packing from valves.  (Plaintiff

3    Depo., Vol. 1, 54: 15 - 55:17.)  Plaintiff was responsible for the integrity of the pipes, and was

4    responsible for getting the lagging repaired. (Plaintiff Depo., Vol. 1, 135: 19 -137: 9.) He did not do

5    the work himself, and was not standing next to the work.  He was, however, close enough to see what

6    they were supposed to be doing, but not close enough to get in their way. (Plaintiff Depo., Vol. 1, 140:

7    1 - 141: 9; Vol. 3, 500: 20 - 22.)

8        Plaintiff never worked at any Todd Shipyard, and could not recall ever working around any

9    Todd employee. (Plaintiff Depo., Vol. 2, 218: 16 - 219: 3)  He did not recall seeing any Long Beach

10   Naval Shipyard workers wearing any masks or respirators in July of 1973.[4] (Plaintiff Depo., Vol. 2,

11   224: 14 - 17.)  He thought he was exposed to asbestos during this period, because Long Beach Naval

12   Shipyard was dusty and dirty. (Plaintiff Depo., Vol. 2, 226: 11  - 227:1.)

13       After his service on the USS DOWNES, Plaintiff became an aviator in the U.S. Navy, served

14   on several other Naval ships (mostly aircraft carriers), and retired as a Commander in 1994.

15   **E.    The State of the Art Knowledge of Risk of Mesothelioma in 1973**

16       The USS DOWNES was built in 1968 and commissioned in 1971, about 2 years before

17   Plaintiff joined her as an Officer.

18       In 1946, Navy officers and Public Health officials published the first epidemiological study

19   evaluating the potential hazards of asbestos, in a paper known as the "Fleischer-Drinker" study.

20   (Declaration of Dr. Ronald Gots, ("Gots  Decl.")  ¶ 15.)  The study involved looking at over 1,000

21   shipyard pipe insulators, where the authors found 3 cases of asbestosis. (*Id.*) Subsequent evaluations

22   of the Fleischer-Drinker demonstrated its flawed methods, but it was the authoritative treatise on the

23   hazards of asbestos until 1964. (Gots Decl., ¶ 17, 18.)

24       In 1970, Congress created the United States Occupational Safety Administration (OSHA),

25   which passed regulations controlling exposures to asbestos-containing products in the workplace.  The

26   5th Circuit Court of Appeal has given a succinct history of the origins of OSHA:

27   _____

28   [4] Plaintiff's expert Charles Ay testified that in 1973, as an insulator for Long Beach Naval Shipyard, he was required
     to wear a respirator when doing asbestos rip-out work. (Ay Dep., 122:2 - 7; 20 -25.)

Congress passed the Occupational Safety and Health Act (the Act) in 1970, codified at 29 U.S.C. §§ 651 (1976). Toward that goal, the Act allows the Secretary of Labor (the Secretary), after public notice and opportunity for comment by interested persons, to promulgate rules and standards for occupational safety and health. *Id.*, at § 655(b).

*   *   *

OSHA has regulated asbestos since 1971. Its first asbestos PEL was 12.0 f/cc. In 1972) OSHA reduced this standard to 5 f/cc [footnote omitted] and in 1976 OSHA again reduced the standard to the currently effective 2 f/cc. (*Asbestos Information Association/North America, et. al. v. Occupational Safety and Health Administration, et. al.* (1984) 727 F.2d 415, 417-418.)

In addition to the newly enacted asbestos regulatory scheme under OSHA, the Navy took direct actions on controlling asbestos exposure even before Plaintiff joined the USS DOWNES in July of 1973:

1.    On February 9, 1971, the Navy issued NAVSHIPS INSTRUCTION 5100.26, entitled "Control of Asbestos Exposure Hazards.":

The ***severe effects of asbestos on the lungs*** is a main factor for considering the ***elimination of asbestos as an insulation material on piping***, ducts and boilers.

2.    On July 1, 1972, the Navy issued NAVAL SHIPS' TECHNICAL MANUAL, CHAPTER 9390, Thermal Insulation, which provided comprehensive safety precautions for Navy personnel to take when working with asbestos:

Part 2. Safety Precautions

Certain mineral dusts (especially asbestos) ***cause pathological changes in the lungs. The damage done is permanent and progressive with continued exposure***.

Finally, Dr. Richard Cohen, Plaintiff's "State-of-Art" expert, has conceded that, by 1973, the Navy knew that asbestos exposure aboard Navy ships could cause mesothelioma and was aware of the precautions that could minimize the risk:

Q:    As of 1973, was the Navy also aware of precautions that could be taken to minimize the risk of asbestos exposure and the risk of developing mesothelioma?

**A:    Yes.** (Cohen Dep., 55:15 - 25.)

## III.    CONCLUSION

Plaintiff's strict liability claim against Todd has been dismissed by Judge Robreno's Order granting Todd's Motion for Partial Summary Judgment. As for the remaining negligence claim,

1   Plaintiff never once worked at Todd, so Todd had no opportunity to supervise his work or protect him

2   from the risk of exposure from asbestos.

3       While Plaintiff was serving aboard the USS DOWNES between 1973-1975, the U.S. Navy

4   knew about the risk of mesothelioma from asbestos, knew of the necessary precautions for working

5   with asbestos to minimize that risk, published numerous documents and manuals which provided clear

6   safety precautions to sailors when working with asbestos, and provided air respirators to crewmembers

7   of the USS DOWNES.  Despite this, Plaintiff, regrettably, never followed these manuals or used a

8   mask, even though OSHA, enshrined in federal law, regulated such asbestos exposures.  There was

9   undeniably a communication breakdown between the Navy, as an institution, and Plaintiff, as an

10  Officer aboard a Navy ship, about the asbestos products and hazards therefrom on the ship.

11      Accepting Mr. Kelly's version of events, it is clear that the Navy did not protect Plaintiff from

12  the asbestos exposure aboard the USS DOWNES.  Todd breached no duty to warn Plaintiff or the

13  Navy of asbestos hazards aboard the USS DOWNES in 1973, because the Navy was fully aware, and

14  Plaintiff should have been fully aware, of such hazards.  Todd's experts, retired Captain Charles

15  Wasson, and industrial hygienist, Dr. LeRoy Balzer, will explain  the procedures by which a Naval

16  ship is built, and how the Navy began investigating and studying the harmful effects of asbestos in

17  the late 1960s, which resulted in the enactment of OSHA in 1971, the first federal regulatory scheme

18  to protect workers from asbestos hazards.

19

20  DATED: April 3, 2015                                    YARON & ASSOCIATES

21

22                                          By: _____

23                                              GEORGE D. YARON
                                                D. DAVID STEELE
24                                              Attorneys for Defendant PUGET SOUND
                                                COMMERCE CENTER, INC., (formerly
25                                              known as TODD SHIPYARDS
                                                CORPORATION)

26

27

28

**CERTIFICATE OF SERVICE**

I am over 18 years of age and not a party to the within action.  I am employed in the County of Alameda; my business address is **Yaron & Associates, 1300 Clay Street, Suite 800, Oakland, CA 94612**

On       **April 3, 2015,** I served the within:

**TRIAL BRIEF OF PUGET SOUND COMMERCE CENTER , INC., formerly known as TODD SHIPYARDS CORPORATION**

on all parties in this action, as addressed below, by causing a true copy thereof to be distributed as follows:

*TO ALL PARTIES ON THE ECF SERVICE LIST*

✖   **VIA ELECTRONIC SERVICE:**  I served a true copy, with all exhibits, electronically on designated recipients through PACER.  Upon completion of electronic transmission of said document(s), a receipt is issued to serving party acknowledging receipt by PACER's system. Once PACER has served all designated recipients, proof of electronic service is returned to the filing party which will be maintained with the original document(s) in our office. This service complies with CCP §101.6.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on **April 3, 2015,** at Oakland, California.


_____
**Edward Cortez**
ecortez@yaronlaw.com